(No. 90470

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* RICHARD A. DEVINE, Appellant, v. $30,700.00 UNITED STATES CURRENCY *et al.*, Appellees.

*Opinion filed March 21, 2002.*

FREEMAN, J., joined by McMORROW and KILBRIDE, JJ., dissenting.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and

Renee G. Goldfarb, Theodore Fotios Burtzos, Anthony M. O'Brien and James Nichols, Assistant State's Attorneys, of counsel), for appellant.

David R. McLenachen and Thomas Peters, both of Chicago, for appellees.

JUSTICE FITZGERALD delivered the opinion of the court:

Pursuant to the Drug Asset Forfeiture Procedure Act (the Act) (725 ILCS 150/1 *et seq.* (West 2000)), the State initiated civil forfeiture proceedings against currency totaling $30,700 and $20,811. The State served notice of the forfeiture proceedings upon claimants Rashawn and Ida Carter (Rashawn and Ida) by certified mail, with return receipts requested (725 ILCS 150/4(A)(1) (West 2000)), to their last known addresses and made additional service by publication (725 ILCS 150/4(A)(3) (West 2000)). The circuit court of Cook County entered a default order forfeiting the claimants' interest in the currency. The appellate court reversed the order of the circuit court. 316 Ill. App. 3d 464, 469. We granted the State's petition for leave to appeal (177 Ill. 2d R. 315) and now reverse the judgment of the appellate court. In this appeal, we examine whether claimants received proper notice of civil forfeiture proceedings under the Act and whether such notice satisfied procedural due process.

## BACKGROUND

On May 23, 1998, the Chicago police received a tip that a man wearing a white jersey had entered the Drexel National Bank, in Chicago, holding a gun. Responding to the tip, police entered the bank and observed a man wearing a white jacket holding a white cylindrical object under his arm. The police officers approached the man, whom they later identified as Rashawn, and performed a

protective pat-down. This pat-down revealed a sock filled with United States currency and additional bundles of currency. The combined amount of currency recovered from Rashawn totaled $30,700.

Following the pat-down, the officers questioned Rashawn and learned that he did not have an existing account at the bank, but that he planned to rent a safety-deposit box. Rashawn provided conflicting answers when asked where he obtained the money and was unable to provide an accurate figure of the amount of money he was carrying. The officers subsequently took Rashawn to the police station for further questioning. At the police station, Rashawn admitted that he was a member of the Gangster Disciples street gang, that he was unemployed and did not own the money, and that he "messed up" trying to deposit the money. Rashawn also informed officers that he had been previously arrested for cannabis possession and that he was out on bond pending a hearing in that case. A background check confirmed a prior arrest and revealed an extensive criminal history, including six adult arrests by the Chicago police, a 1992 narcotics possession conviction, the use of multiple aliases, an arrest in Sangamon County, Illinois, for possession of a controlled substance, and the use of separate invalid driver's licenses with addresses in both Chicago and Springfield, Illinois.

The officers performed a "money lineup" with the currency. The money was "hidden" and subsequently "discovered" by a narcotic-sniffing police dog. The police dog positively identified the money as having a residue odor of narcotics.

Officers also discovered in Rashawn's possession three separate safety-deposit box keys. Although Rashawn initially denied any knowledge about the keys, he ultimately informed the officers that the keys belonged to "two separate banks in Peoria, Illinois." The officers,

however, ascertained that one of the keys belonged to a safety-deposit box held at the Drexel National Bank in Chicago. The State asserts that the box was registered to Ida, Rashawn's grandmother, and that the key to the box granted Rashawn access to its contents. On May 26, 1998, the officers obtained and executed a search warrant and recovered $20,811 from the safety-deposit box. The officers then performed a separate "money lineup" with a second narcotic-sniffing police dog on the currency totaling $20,811. This second dog also gave a positive indication for the odor of narcotics on the currency.

Five days after the Chicago police executed the warrant, Ida telephoned the police to inquire about the contents of the safety-deposit box. When the officer questioned Ida about the safety-deposit box, Ida was unable to identify its contents. Ida did not indicate to the police that she possessed any interest in the contents of the safety-deposit box. Notwithstanding, officers scheduled two separate appointments with Ida so that she could establish a claim to its contents. Ida failed to keep either appointment with the police.

On August 4, 1998, the State filed a consolidated *in rem* complaint for forfeiture of the $30,700 and $20,811 pursuant to section 505 of the Illinois Controlled Substances Act (720 ILCS 570/505 (West 2000)). The complaint named Rashawn as a party with interest in the currency. The complaint alleged, *inter alia*, that the Gangster Disciples street gang is an active criminal organization that participates in the illegal distribution of prohibited substances through its members, who will often use safety-deposit boxes to conceal and store proceeds from ongoing drug operations. The complaint further alleged that in obtaining safety-deposit boxes these drug dealers often use false names or the identities of relatives and third parties to conceal the true identity of the owner and to hide the location of the proceeds.

Finally, the complaint alleged that the gang often uses individuals as couriers to transport currency to safe storage locations.

On the same day, the State mailed notice of the forfeiture proceedings and a copy of the *in rem* complaint via certified mail, with a return receipt requested, to Rashawn at his last known address on Chicago's south side. The notice was accompanied by an affidavit of an assistant State's Attorney who verified the method of service, identified the party having an interest in the money, and asserted that no claim to the money had been filed. The State concedes that it did not receive a return receipt from the August 4 mailing. The State also made additional service by publication of the forfeiture proceedings on August 7, August 14, and August 21 in the Chicago Daily Law Bulletin. Rashawn did not respond to the notice of forfeiture or appear before the court at the forfeiture proceeding.

Following the mailing to Rashawn and notice by publication, the State made additional efforts to serve notice of the proceedings to additional potential parties of interest. The record shows that on September 2, 1998, the State sent notice of forfeiture by certified mail to Ida at her address, on Chicago's south side, also Rashawn's last known address. As with the previous mailing, the State concedes, it did not receive a return receipt from the September 2 mailing. Ida did not appear before the court at the forfeiture proceeding.

On October 13, 1998, the circuit court entered a default order forfeiting Rashawn's interest and that of all other parties claiming right, title, or interest in the currency. On January 13, 1999, Rashawn and Ida filed a joint motion to vacate the forfeiture, alleging that they never received notice of the forfeiture proceeding. Rashawn provided an affidavit stating that he was incarcerated for unrelated charges in the Vandalia Cor-

rection Center beginning July 7, 1998, until his release November 10, 1998. In her affidavit, Ida claimed that she was the owner of the safety-deposit box at the Drexel National Bank and never received notice of forfeiture at her residence. The circuit court denied the motion to vacate the forfeiture order.

The appellate court reversed the judgment of the circuit court, holding that the circuit court lacked personal jurisdiction over Rashawn and Ida because they were not properly served in accord with the Act. 316 Ill. App. 3d at 474-75. According to the appellate court, complete service under the Act is accomplished when the State receives a return receipt signed by the addressee. 316 Ill. App. 3d at 469. Moreover, the appellate court held that the State failed to give Rashawn notice required by due process. 316 Ill. App. 3d at 471. This appeal by the State followed.

## ANALYSIS

### I. Effective Notice Under the Act

As an initial matter, we review whether service is perfected under the Act upon mailing of the notice or, conversely, upon receipt of the certified mail return receipt signed by the addressee. The parties agree that absent proper notice of the forfeiture proceedings, the circuit court lacked jurisdiction and the power to order forfeiture of the currency. The parties also agree that the State never received certified mail return receipts of the notice mailings sent to both claimants. However, the State argues that failure to receive these return receipts does not render the notice defective. Rather, the State argues that service is effective under the Act upon the mere mailing of notice by certified mail, as long as the notifying party had no reason to suspect that the notice would not reach the intended recipient. This matter involves an issue of statutory interpretation, and our

review is *de novo. Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000).

The Act is a remedial civil sanction enacted for the express purpose of deterring the rising incidence of the abuse and trafficking of substances prohibited by the Illinois Controlled Substance Act (720 ILCS 570/100 *et seq.* (West 2000)) and the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 2000)). See 725 ILCS 150/2 (West 2000). Forfeiture under the Act "encourages owners 'to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes.'" *In re P.S.*, 175 Ill. 2d 79, 87 (1997), quoting *United States v. Ursery*, 518 U.S. 267, 135 L. Ed. 2d 549, 116 S. Ct. 2135 (1996). Thus, the Act is designed to serve a remedial purpose and, therefore, is liberally construed to achieve that purpose. 725 ILCS 150/13 (West 2000). Moreover, it is the intent of the legislature that the Act be interpreted in light of "the federal forfeiture provisions contained in 21 U.S.C. 881 as interpreted by the federal courts, except to the extent" the provisions expressly conflict. 725 ILCS 150/2 (West 2000).

The Act contains uniform procedures to accomplish the forfeiture of drug-related assets. 725 ILCS 150/1 *et seq.* (West 2000). Non-real property is seized by two different methods depending on the value of the property. Non-real property valuing less than $20,000 is forfeited in a nonjudicial forfeiture action. 725 ILCS 150/6 (West 2000). Where the value of non-real property exceeds $20,000, the State shall "institute judicial in rem forfeiture proceedings" in accordance with section 9 of the Act. 725 ILCS 150/6 (West 2000).

The Act outlines the method of notice required to apprise individuals of pending forfeiture proceedings. 725 ILCS 150/4 (West 2000). The method of service depends upon the State's knowledge of the identity and location of the claimant at the time of service. Section 4 of the

Act, entitled "Notice to Owner or Interest Holder," provides that, "[i]f the owner's or interest holder's name and current address are known, then [notice or service shall be given] by either personal service or mailing a copy of the notice by certified mail, return receipt requested, to that address." 725 ILCS 150/4(A)(1) (West 2000). The Act requires notice by publication in the event the address or name of the owner or interest holder is unknown. 725 ILCS 150/4(A)(3) (West 2000). Owners or interest holders are obligated to advise the seizing agency of address changes that occur prior to the mailing of notice. 725 ILCS 150/4(A)(1) (West 2000) ("if an owner or interest holder's address changes prior to the effective date of the notice of pending forfeiture, the owner or interest holder shall promptly notify *** of the change in address"). Individuals claiming an interest in the property subject to forfeiture may file a claim to the property within "45 days after the effective date of notice." 725 ILCS 150/6(C)(1) (West 2000). Further, the Act provides when notice is effective: "Notice served under this Act is effective upon personal service, the last date of publication, or the mailing of written notice, whichever is earlier." 725 ILCS 150/4(B) (West 2000). If parties fail to appear at the forfeiture proceedings, "property may be subject to forfeiture even if no one appears to claim it." *In re P.S.*, 175 Ill. 2d at 88.

In order to determine when mailed notice is perfected under the Act, we are bound by long-standing principles of statutory construction. We must give effect to legislative intent, which begins with the plain language of the statute. *People v. Woodard*, 175 Ill. 2d 435, 443 (1997); *Garza v. Navistar International Transportation Corp.*, 172 Ill. 2d 373, 378 (1996); *People ex rel. Baker v. Cowlin*, 154 Ill. 2d 193, 197 (1992). Where clear and unambiguous, statutory language must be enforced as enacted, and a court may not depart from its plain language by read-

ing into it exceptions, limitations, or conditions not expressed by the legislature. *Woodard*, 175 Ill. 2d at 443. Moreover, where language is express and plain, a court must not search for subtle intentions of the legislature. *Woodard*, 175 Ill. 2d at 443.

In light of the express language contained in section 4 of the Act, we hold that service of notice by mailing is perfected when the notice is deposited in the mail, provided the State complies with the mailing procedures set forth in the Act. Section 4(B) expressly states, "[n]otice served under this Act is effective upon *** the mailing of written notice ***." 725 ILCS 150/4(B) (West 2000). The meaning of this provision is clear and unambiguous. The Act does not condition the effectiveness of notice upon receipt of the return receipt signed by the addressee, and this court will not rewrite the Act to create this requirement.

Claimants argue that the inclusion of the "return receipt" language implies that the legislature intended that notice would not be perfected unless and until the State receives the return receipt. This argument fails to consider the structure of section 4, which, when plainly read, supports another conclusion. Section 4(A) directs the State to issue notice of forfeiture proceedings by specific methods—personal service, publication, or postal delivery. Essentially, section 4(A) directs how notice shall be given, or by what means notice must be served. Where postal delivery is required, section 4(A) requires service by certified mail with a return receipt requested. In contrast, section 4(B) fixes when service is complete. Service is effective "upon personal service, the last date of publication, or the *mailing of written notice*, whichever is earlier." (Emphasis added.) 725 ILCS 150/4(B) (West 2000). The return receipt requirement is omitted from the "when" provision of section 4(B).

Clearly, our legislature is able to expressly condition

service upon receipt of the signed return receipt. Other enactments expressly demand a return receipt to complete service. See, *e.g.*, 225 ILCS 115/18 (West 2000) (Veterinary Medicine and Surgery Practice Act of 1994)' (notice is given to the owner "by certified mail, return receipt requested, and shall allow a period of 7 days to elapse after the receipt is returned before disposing of such animal"); 705 ILCS 405/2—30(1)(a) through (1)(c) (West 2000) (Juvenile Court Act of 1987) ("[t]he return receipt, when returned to the clerk, shall be attached to the original notice, and shall constitute proof of service"); 750 ILCS 25/10(a)(1) (West 1998) (Expedited Child Support Act of 1990) ("[i]f service is made by certified mail, the return receipt shall constitute proof of service"); 765 ILCS 1033/15(b) (West 1998) (Museum Disposition of Property Act) ("[n]otice is deemed given if the museum receives, within 60 days of mailing the notice, a return receipt"). Therefore, based upon our principles of statutory construction and the clear difference in wording between sections 4(A) and 4(B), we must construe the omission of the return receipt requirement from section 4(B) as intentional. See *People v. Parvin*, 125 Ill. 2d 519, 525 (1988) (the inclusion of specific language in one provision and the omission in another provision evinces legislative intent to refrain from imposing the requirement); see also *People v. Keene*, 296 Ill. App. 3d 183, 189-90 (1998).

Citing *Avdich v. Kleinert*, 69 Ill. 2d 1 (1977), the appellate court reasoned that the mere inclusion of a return receipt requirement in any portion of section 4 implies that the return of the receipt is required for notice to be effective. 316 Ill. App. 3d at 469. Specifically, the appellate court stated, "[t]hat the party giving notice must receive a return receipt signed by the addressee in order to accomplish service is a well-established requirement in Illinois law." 316 Ill. App. 3d at 469. *Avdich* is not authority for the proposition that all enactments which

contain the "return receipt" requirement demand return of the receipt to perfect service. In fact, *Avdich*, like the enactments previously referred to, illustrates our legislature's ability to *expressly* condition service upon receipt of the signed receipt. In *Avdich*, we considered the notice requirement under the forcible entry and detainer statute. See 735 ILCS 5/9—211 (West 2000). As in the instant matter, the parties in *Avdich* disputed whether the mere mailing of notice by certified mail constituted service or whether the statute required receipt of the return receipt in order to complete service. The forcible entry and detainer statute states that "[a]ny demand may be made or notice served *** by sending a copy of said notice to the tenant by certified or registered mail, with a returned receipt from the addressee." 735 ILCS 5/9—211 (West 2000). Based upon this language, we held that the "statute clearly indicates a legislative intent that service of a notice by certified mail is not to be considered complete until it is received by the addressee." *Avdich*, 69 Ill. 2d at 9. However, the forcible entry and detainer statute conditions effectiveness of notice upon "a *returned* receipt from the addressee." By contrast, the Act only requires "with a return receipt *requested*." If we afford the language in each provision its plain and ordinary meaning, one demands the return of the receipt while the other merely demands a request.

Claimants argue that the only advantage of certified mail with a return receipt requested is to provide proof of delivery. Proof of delivery is not the only discernable advantage. Rather, the inclusion of a return receipt request requirement in the statute serves more than one purpose. According to the certified mailing receipt contained in the record, each piece of certified mail is assigned a tracking number, and a record of all deliveries is kept by the postal service for a period of two years. This information grants the sender actual proof of mailing.

This proof of mailing is objective evidence for the State during forfeiture proceedings. This proof of mailing, therefore, facilitates overall enforcement of the Act. This mailing method also serves a claimant's interest. Parties who receive certified mail with a return receipt requested are alerted to the importance of its contents and are less likely to discard the mail upon receipt without reading its contents.

Finally, we must also consider that the Act is remedial in nature; therefore, the Act warrants liberal construction to achieve the overall purpose of the statute. 725 ILCS 150/2, 13 (West 2000). The appellate court's holding, that the State must receive a return receipt signed by the addressee, fails to recognize the circumstances which often accompany forfeiture. It is frequently the case that currency is seized from individuals who provide false address information to the officers upon seizure. In this case, we observe that at the time of seizure, Rashawn held licenses with two alias addresses in the State of Illinois. Moreover, as noted by the State during oral arguments and in its complaint, it is also common that individuals in possession of the currency at the time of seizure are merely couriers used to transport the currency. These individuals have no interest in receiving the certified mail and, therefore, refuse to sign for the mail upon its arrival. Conditioning the completion of notice upon receipt of the return receipt is a condition not expressed by the legislature, and given the realities of what often occurs in these cases, an obstacle to the enforcement of the Act. The statute provides for mailing of notice to the last known address of the owner or interest holder. It does not condition this mailing upon the State's investigation into the accuracy of this information. In fact, it expresses the contrary: the owner or interest holder is obligated to notify the seizing agency of his or her change in address occurring prior to the mailing

of notice. 735 ILCS 150/4(A)(1) (West 2000). The appellate court's holding renders this obligation superfluous. See *Yang v. City of Chicago*, 195 Ill. 2d 96, 106 (2001) ("[w]e construe a statute so that no term is rendered superfluous or meaningless, when the statute is examined as a whole").

The record shows that on August 4, 1998, pursuant to section 4(A)(1) of the Act the State mailed notice to Rashawn via certified mail with a return receipt requested. The State mailed this notice pursuant to information supplied by Rashawn on the date of seizure, May 23, 1998. The record does not show that Rashawn notified the State of a change in his address. Pursuant to our holding, we find that service of this notice was complete upon its mailing, August 4, 1998. The record also shows that pursuant to section 4(A)(1), on September 4, 1998, the State mailed notice to Ida at the address believed to be her residence. Consistent with our holding, service was complete upon its mailing, September 4, 1998.

## II. Due Process

We now turn to whether notice in this instance satisfied procedural due process. According to the appellate court, notice mailed to Rashawn's home address was "not reasonably calculated to apprise Rashawn of the pending forfeiture proceeding." 316 Ill. App. 3d at 471. The appellate court concluded that because Rashawn's address at the Vandalia Correctional Center was "readily ascertainable," failure to send notice of forfeiture to this address denied Rashawn due process of law. 316 Ill. App. 3d at 471. We disagree. The State provided constitutionally adequate notice.

Whether claimants were afforded due process in the instant matter is an issue of law, and any review is *de novo*. *People v. Dameron*, 196 Ill. 2d 156, 162 (2001); see also *People v. Anaya*, 279 Ill. App. 3d 940, 944-45 (1996).

"Due process entails an orderly proceeding wherein a

person is served with notice, actual or constructive, and has an opportunity to be heard and to enforce and protect his rights." *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 432 (1990). The "fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Stratton*, 133 Ill. 2d at 432; see also *Dusenbery v. United States*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694 (2002); *Greene v. Lindsey*, 456 U.S. 444, 449-50, 72 L. Ed. 2d 249, 254-55, 102 S. Ct. 1874, 1877-78 (1982); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 94 L. Ed. 865, 873, 70 S. Ct. 652, 657 (1950). Due process is satisfied if the "manner of effecting service of summons gives reasonable assurance that notice will actually be given." *People ex rel. Loeser v. Loeser*, 51 Ill. 2d 567, 572 (1972); see also *Stratton*, 133 Ill. 2d at 432-33; *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657 (the method of service must be one the party receiving service "might reasonably adopt to accomplish" service). Put another way, notice cannot be a "mere gesture," but rather must be a reasonable attempt to inform those affected by the proceeding. *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657; see *Stratton*, 133 Ill. 2d at 432-33. It is important to note, however, that in examining the sufficiency of notice with regard to due process a court may consider the character of the proceedings and the practicalities and peculiarities of the case. See *Stratton*, 133 Ill. 2d at 433; see also *Mullane*, 339 U.S. at 317, 94 L. Ed. at 875, 70 S. Ct. at 659.

Further, as recently stated by the United States Supreme Court, due process does not require that "the State *must provide* actual notice, but that it *must attempt to provide* actual notice." (Emphases in original.)

*Dusenbery*, 534 U.S. at 170, 151 L. Ed. 2d at 606, 122 S. Ct. at 701. In *Dusenbery*, the United States Supreme Court considered the constitutional sufficiency of forfeiture when notice was sent by certified mail to a petitioner where he was incarcerated but, according to the petitioner, he never actually received the notice from the prison mailroom. The petitioner argued that the government had the burden of securing actual delivery of the notice because the government had the ability to ensure the petitioner's receipt. For example, the defendant argued that due process required that a prison official watch the inmate open the notice and cosign a receipt. The Court disagreed.

"Petitioner argues that because he was housed in a federal prison at the time of the forfeiture, the FBI could have made arrangements with the BOP [Bureau of Prisons] to assure the delivery of the notice in question to him. [Citation.] But it is hard to see why such a principle would not also apply, for example, to members of the Armed Forces both in this country and overseas. Undoubtedly the Government could make a special effort in any case (just as it did in the movie 'Saving Private Ryan') to assure that a particular piece of mail reaches a particular individual who is in one way or another in the custody of the Government. *** But the Due Process Clause does not require such heroic efforts by the Government; it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action ***." *Dusenbery*, 534 U.S. at 170, 151 L. Ed. 2d at 606-07, 122 S. Ct. at 701.

Despite the dissent's contention, the Court did not hold that "[i]n the event the property owner is incarcerated, the government must send the notice to the owner at his place of incarceration." 199 Ill. 2d at 168 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.). This issue was not considered by the Court. Instead, the Court considered the constitutional sufficiency of the mail delivery and distribution system once mail arrived

to the prison. *Dusenbery*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694.

Turning to the instant matter, the appellate court determined that the sending of notice to a claimant at his home address while the claimant is incarcerated fails to reasonably apprise the claimant of the pending forfeiture proceedings. 316 Ill. App. 3d at 469. The appellate court based its decision upon both Illinois appellate and federal decisions. See *Robinson v. Hanrahan*, 409 U.S. 38, 34 L. Ed. 2d 47, 93 S. Ct. 30 (1972); *Ramirez v. United States*, 767 F. Supp. 1563 (M.D. Fla. 1991); *Winters v. Working*, 510 F. Supp. 14 (W.D. Tex. 1980); *Jaekel v. United States*, 304 F. Supp. 993 (S.D.N.Y. 1969); *United States v. Woodall*, 12 F.3d 791 (8th Cir. 1993); *People v. Smith*, 275 Ill. App. 3d 844 (1995). These cases do not convince this court that claimants were denied due process.

For example, in *Smith* the defendant was arrested for the possession of cocaine and cannabis. *Smith*, 275 Ill. App. 3d at 846. At the time of his arrest, officers seized the sum of $106 from the defendant. Notice of pending forfeiture was sent to the defendant's home address. Defendant failed to reply or appear, and the court ordered forfeiture of the currency. The appellate court held that the State failed to give notice required by due process because notice of the forfeiture proceedings was mailed to defendant's residential address despite the State's knowledge that the defendant was confined to jail for charges brought at the time of seizure. *Smith*, 275 Ill. App. 3d at 850-51. Similarly, in *Robinson* the defendant was arrested and charged with armed robbery. *Robinson*, 409 U.S. at 38, 34 L. Ed. 2d at 48, 93 S. Ct. at 30. The defendant was held in custody awaiting trial when the State initiated forfeiture proceedings against the automobile used by the defendant at the time of his arrest. The State issued notice of forfeiture proceedings to the ad-

dress listed with the Secretary of State. In an *ex parte* hearing, the trial court ordered forfeiture of the automobile. On appeal to the United States Supreme Court, the Court reversed forfeiture because the State knew that the defendant "could not get to [the address to which notice was mailed] since he was at that very time confined" in the jail. *Robinson,* 409 U.S. at 40, 34 L. Ed. 2d at 49, 93 S. Ct. at 31.

In the above-mentioned cases, and other cases relied upon by the appellate court and claimants, we find one critical factor present which is absent in the instant matter: the notifying party knew the claimant's name and address and failed to serve notice to that address. See, *e.g., Schroeder v. City of New York,* 371 U.S. 208, 210, 9 L. Ed. 2d 255, 258, 83 S. Ct. 279, 281 (1962) (the appellant's name and address were known from both deed records and tax rolls); *Woodall,* 12 F.3d at 794-95 (notice mailed to the defendant at home and jail was insufficient because the government knew the defendant was released on bond to a different temporary residence); *Williams v. United States Drug Enforcement Administration,* 51 F.3d 732, 734 (7th Cir. 1995) (notice mailed to the claimant's residential address was insufficient because although he was incarcerated on unrelated charges, the seizing agency was "well aware of his incarceration" and had weekly conversations with him at the jail at the time it mailed notice to his residence); *Jaekel,* 304 F. Supp. at 999 (the seizing agency had plaintiff's name and address; therefore, notice by publication was insufficient); *Montgomery v. Scott,* 802 F. Supp. 930, 936 (W.D.N.Y. 1992) (at the time of his arrest for the possession and sale of a controlled substance, officers seized $32,000 in currency, holding that " 'where the state *knows* that an interested party does not reside at the mailing address *** due process may require more than sending a letter to the address on file' " (emphasis in original)), quoting *Weigner*

*v. City of New York*, 852 F.2d 646, 650 n.4 (2d Cir. 1988). Often in forfeiture cases, the party claiming interest in the subject property was incarcerated or confined to jail for conduct related to the seizure of property. As a result, the arrest and seizure were interrelated, such that the seizing agency knew the claimant's actual location. Therefore, in instances where the seizing agency has knowledge the individual is incarcerated, notice mailed to the individual's listed last known address is 'a mere gesture and not reasonably calculated to apprise the individual of the pending proceedings.

A federal court case is helpful in the instant matter. In *Sarit v. U.S. Drug Enforcement Administration*, 987 F.2d 10 (1st Cir. 1993), the court of appeals addressed whether notice mailed to the claimant's last known address, which was returned "unclaimed," and was supplemented by publication satisfied due process. In *Sarit*, the claimants argued that the DEA knew that they were represented by counsel and planned to contest forfeiture. Therefore, they argued that when the notice was returned "unclaimed," the DEA's failure to contact counsel and acquire their current address denied them due process. The court of appeals disagreed:

"We note at the onset that while *Mullane* clearly contemplates inquiry into the 'peculiarities' and the 'practicalities' of a given case, it has not generally been interpreted to require a party to make additional attempts beyond notice that is legally satisfactory at the time it is sent. [Citation.] The Court has read an implicit bad faith standard into the notice inquiry, overturning notice even where formal procedures were followed if the notifying party knew or had reason to know that notice would be ineffective. [Citations.] ***

Virtually all of the cases relied upon by plaintiffs share the feature—missing from this case—that *the government knew at the time the notice was sent that the notice was likely to be ineffective.* [Citations.]

*** Only exceptional circumstances would compel us to

so extend the DEA's duty, absent indication that it knew or should have known that the notice would be ineffective." (Emphasis added.) *Sarit*, 987 F.2d at 14-15.

Likewise, we have considered the "peculiarities" and circumstances of the instant matter. Here, there is no evidence in the record that the seizing agency knew or should have known Rashawn was incarcerated in the Vandalia Correctional Center. Rather, Rashawn's subsequent arrest and incarceration were unrelated to the seizure of the currency at issue here. In fact, Rashawn was incarcerated in a separate county for a separate crime approximately six weeks after officers seized the currency. The record shows that on May 23, 1998, at the time of seizure, Rashawn gave his address to the officers and freely left the station. This was Rashawn's final contact with the seizing agency; he did not notify the seizing agency of his change of address. 725 ILCS 150/4(A)(1) (West 2000). We note that Rashawn does not allege that the State had actual notice of his whereabouts at the time notice was mailed. Importantly, the parties do not dispute that the information Rashawn provided on May 23, 1998, was, according to the seizing agency, his last known address. Moreover, based upon the record in this case—which is sparse on the issue of Ida's involvement—there is nothing to suggest the State had contradictory information regarding Ida's address. Rather, the record shows that after her June 5, 1998, telephone conversation with an officer following the seizure of the currency, she never contacted the police again or appeared personally to establish a claim. (In oral argument counsel for claimants referenced two phone conversations between Ida and the police; however, the record belies this assertion.) Notwithstanding this discrepancy, importantly, Ida does not argue that the State mailed the notice to an incorrect address. Rather, Ida simply claims that she never received the mailing. The claimants argue that the State must investigate and verify each address

prior to service of notice. However, such "heroic efforts" are not required. *Dusenbery*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694. Moreover, the circumstances of this case do not demand that we extend the State's duty in this manner.

Regardless, we observe that the State did make additional attempts to afford notice in the instant case. This is evident by the State's attempt to supplement the notice mailing with notice by publication. Pursuant to the Act, the State published notice of the forfeiture proceedings on three separate occasions. According to the Act, publication is only acceptable where the claimant's address is unknown. 725 ILCS 150/4(A)(3) (West 2000). However, the peculiar circumstances and facts known by the State, namely, Rashawn's history of alias addresses throughout the state, led it to take further action. Although we do not find that this additional effort was required, either by the statute or by due process, this effort to supplement the notice mailing made the risk of nonreceipt more acceptable. See *Weigner v. City of New York*, 852 F.2d 646, 651 (2d Cir. 1988) ("The Supreme Court has repeatedly held that notice by first-class mail is sufficient, notwithstanding the Court's obvious awareness that not every first-class letter is received by the addressee *** [p]articularly where mailing is supplemented by other forms of notice such as posting or publication, the risk of non-receipt is constitutionally acceptable").

## CONCLUSION

Accordingly, we hold that under the Drug Asset Forfeiture Procedure Act, where notice of forfeiture is mailed by certified mail with a return receipt requested, service is complete upon the mere mailing of the written notice. Additionally, we conclude that notice in this case was reasonably calculated to apprise all interested parties of the pending proceedings and, therefore, satisfied due process of law.

The judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE FREEMAN, dissenting:

The majority holds that claimant, Rashawn Carter, received appropriate notice of the forfeiture proceedings at issue. I disagree. Due process requires the government to provide notice that is reasonably calculated to apprise interested parties of the forfeiture proceedings and afford the parties an opportunity to be heard. In the present case, the notice the State gave Rashawn fell far short of the requirements of due process.

## BACKGROUND

On May 23, 1998, police officers responded to a tip that a man with a gun had entered the Drexel National Bank. Upon their arrival at the bank, the officers observed Rashawn holding a white cylinder-shaped object under his arm. The officers performed a protective pat-down of Rashawn and found several bundles of currency. The white cylinder-shaped object was actually a sock filled with additional currency. In all, the officers recovered $30,700 from Rashawn.

The officers questioned Rashawn and learned that he did not have an existing account at the bank, but that he planned to rent a safety-deposit box. Rashawn gave conflicting answers when asked where he had obtained the money and was unable to tell the officers how much money he was carrying. The officers took Rashawn to the police station for further questioning. At the station, Rashawn admitted that he was a member of a gang, that he was unemployed and that he did not own the money. Rashawn also told the officers that he had been arrested for possession of cannabis and was out on bond pending a hearing. A background check confirmed this arrest and

also revealed that Rashawn had been arrested several times in Sangamon County, the last arrest on September 30, 1997.

The officers performed a "money lineup," at which a police dog positively identified the currency as having a residue odor of narcotics. A further search of Rashawn revealed three separate safety-deposit box keys. One of the keys was for a safety-deposit box at the Drexel National Bank registered to Ida Carter, Rashawn's grandmother. The officers obtained a search warrant for the safety-deposit box. During a subsequent search of the box, the police recovered $20,811. A police dog positively identified the currency as having a residue odor of narcotics. The State did not prosecute Rashawn for any narcotics violation in connection with the currency.

On August 4, 1998, the State filed a complaint for forfeiture of the $30,700 and $20,811. The complaint named Rashawn as a party with interest in the currency. On the same day, the State mailed notice of the forfeiture proceedings and a copy of the complaint via certified mail, with a return receipt requested, to Rashawn at 4844 S. State Street, Chicago, Illinois. The State did not receive a return receipt from the mailing. The State then published notice of the forfeiture proceedings on August 7, August 14 and August 21 in the Chicago Daily Law Bulletin. And on September 2, 1998, the State sent a notice of forfeiture by certified mail to Ida at 4844 S. State Street. The State did not receive a return receipt from the September 2 mailing. Neither Rashawn nor Ida appeared at the forfeiture proceedings.

On October 13, 1998, the circuit court entered a default order forfeiting Rashawn's interest and that of all other parties claiming right, title, or interest in the currency. On January 13, 1999, Rashawn and Ida filed a joint motion to vacate the forfeiture, alleging that they did not receive notice of the forfeiture proceedings. In

support of the motion, Rashawn averred that he was incarcerated for unrelated charges in the Vandalia Correction Center beginning July 7, 1998, until his release November 10, 1998. Ida also filed an affidavit in which she averred that she was the owner of the safety-deposit box and she did not receive the notice of the forfeiture proceedings mailed to her home. The circuit court denied the motion to vacate the forfeiture order.

The appellate court reversed, finding that the circuit court lacked personal jurisdiction over Rashawn and Ida because they were not properly served. 316 Ill. App. 3d 464, 471. The court noted further that numerous federal courts have questioned the probative value of positive dog alerts due to reports that reveal the high level of contamination of the nation's money supply with narcotics residue. 316 Ill. App. 3d at 472. The court adopted the view of these federal courts that the mere fact of prior contamination fails to establish that the currency was actually exchanged for or intended to be exchanged for drugs by the person currently in possession of the currency. 316 Ill. App. 3d at 473. Accordingly, the court concluded that the "sniff test" was not enough to establish probable cause that the currency seized from Rashawn was connected to narcotics. 316 Ill. App. 3d at 473.

## ANALYSIS

The due process clauses of the fifth and fourteenth amendments to the Constitution of the United States require, at a minimum, that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 94 L. Ed. 865, 873, 70 S. Ct. 652, 656-57 (1950). See also *Dusenbery v. United States*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694 (2002). In *Mullane*, the Supreme Court explained the principles involved,

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance, [citation]. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied. 'The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.' [Citations.]

But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, [citation], or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane*, 339 U.S. at 314-15, 94 L. Ed. at 873-74, 70 S. Ct. at 657-58.

Notice by publication is not a favored mode of process. As the Supreme Court explained in *Mullane*,

"[i]t would be idle to pretend that publication alone as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts. *** Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed." *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 658.

Where the names and addresses of interested parties are

not known, notice by publication must be accepted out of necessity. However,

"[e]xceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties. Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency." *Mullane*, 339 U.S. at 318, 94 L. Ed. at 875, 70 S. Ct. at 659.

The incarceration of a party with an interest in property being forfeited shapes the notice by due process. In *Robinson v. Hanrahan*, 409 U.S. 38, 34 L. Ed. 2d 47, 93 S. Ct. 30 (1972), the appellant was arrested on a charge of armed robbery on June 16, 1970. The State instituted forfeiture proceedings against the appellant's car, alleging that the appellant had used the car in the armed robbery. The appellant was held in custody in the Cook County jail from June 16, 1970, to October 7, 1970, awaiting trial. Nevertheless, the State mailed notice of the forfeiture proceedings to appellant's home address as listed in the records of the Secretary of State, and not to the jail facility. In finding the notice ineffective, the Supreme Court explained,

"In the instant case, the State knew that appellant was not at the address to which the notice was mailed and, moreover, knew also that appellant could not get to that address since he was at that very time confined in the Cook County jail. Under these circumstances, it cannot be said that the State made any effort to provide notice which was 'reasonably calculated' to apprise appellant of the pendency of the forfeiture proceedings." *Robinson*, 409 U.S. at 40, 34 L. Ed. 2d at 49, 93 S. Ct. at 31-32.

In *Dusenbery*, 534 U.S. at 168, 151 L. Ed. 2d at 605, 122 S. Ct. at 700, quoting *Mullane*, 339 U.S. at 314, 94 L. Ed. at 873, 70 S. Ct. at 657, the Supreme Court reaffirmed that the government must give a property owner notice that is " 'reasonably calculated, under all the cir-

cumstances' " to apprise the owner of the pendency of the forfeiture. In the event the property owner is incarcerated, the government must send the notice to the owner at his place of incarceration. Although the government need not show that the property owner received the notice, the method chosen by the government in attempting notice, that is, the procedures used by the government in mailing the notice and in processing the mail at the correctional facility, must be defendable " 'on the ground that it is in itself reasonably certain to inform those affected.' " *Dusenbery*, 534 U.S. at 170, 151 L. Ed. 2d at 606, 122 S. Ct. at 701, quoting *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657.

Applying these principles to the facts at issue, the Supreme Court found that the notice the government gave the property owner satisfied the requirements of due process. The Supreme Court explained,

> "The Government here carried its burden of showing the following procedures had been used to give notice. The FBI sent certified mail addressed to petitioner at the correctional facility where he was incarcerated. At that facility, prison mailroom staff traveled to the city post office every day to obtain all the mail for the institution, including inmate mail. \*\*\* The staff signed for all certified mail before leaving the post office. Once the mail was transported back to the facility, certified mail was entered in a logbook maintained in the mailroom. \*\*\* A member of the inmate's Unit Team then signed for the certified mail to acknowledge its receipt before removing it from the mailroom, and either a Unit Team member or another staff member distributed the mail to the inmate during the institution's 'mail call.' " *Dusenbery*, 534 U.S. at 168-69, 151 L. Ed. 2d at 605-06, 122 S. Ct. at 700.

The method chosen by the government in attempting notice was reasonable in light of the procedures followed by the FBI and the correctional institution.

*Dusenbery*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694, is based squarely upon *Mullane*, 339 U.S. at 306,

94 L. Ed. at 865, 70 S. Ct. at 652, and *Robinson*, 409 U.S. 38, 93 S. Ct. 30, 34 L. Ed. 2d 47. It holds that the government must mail notice to the property owner at the place of incarceration. However, the government need not show that the property owner received the notice, in order to comply with due process.

The majority rejoins,

"Despite the dissent's contention, the Court did not hold that '[i]n the event the property owner is incarcerated, the government must send the notice to the owner at his place of incarceration.' 199 Ill. 2d at 168 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.). This issue was not considered by the Court. Instead, the Court considered the constitutional sufficiency of the mail delivery and distribution system once mail arrived to the prison. *Dusenbery*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694." 199 Ill. 2d at 157-58.

The majority's construction of *Dusenbery* is simplistic, if not surprising. If due process did not require that mail be sent to the property owner at the place of incarceration, the Court would not have considered the "constitutional sufficiency of the mail delivery and distribution system once mail arrived to the prison." Rather, the Court would have considered either the notice sent to the property owner at the house trailer where he was arrested or the notice sent to the property owner in Randolph, Ohio, the town where his mother lived, sufficient to comply with due process. Of course, such a holding would be contrary to *Robinson*, where, as noted above, the Court held that notice mailed to the property owner's home address as listed in the records of the Secretary of State, but not to the jail facility, was ineffective.

Perhaps the majority is intimating that *Robinson* is not good law, or that *Dusenbery* has limited *Robinson* in some fashion. Given the fact that *Dusenbery* did not criticize or, in any way, diminute the holding in *Robinson*, I, for one, believe that *Robinson* remains good law.

Turning to the facts of this case, Rashawn was

incarcerated at Vandalia Correctional Center at the time the State mailed the notice of forfeiture to his home. The State did not receive a return receipt from the mailing and was thus alerted to the fact that the notice was ineffective. The State, however, made no attempt to send notice of the forfeiture to Rashawn at Vandalia. Instead, the State was satisfied with publication of notice in the Daily Law Bulletin. Such notice fell woefully short of due process. The State knew, or should have known, that Rashawn was incarcerated at Vandalia. Consequently, the State was required to send notice to Rashawn at Vandalia.

In a forfeiture proceeding, the interest of the property owner is potentially great. See 725 ILCS 150/6 (West 1998) (providing for administrative forfeiture of nonreal property valued at less than $20,000, and judicial *in rem* forfeiture proceedings for nonreal property that exceeds $20,000). As noted in *Weng v. United States*, 137 F.3d 709, 714 (2d Cir. 1998),

> "A person who violates the narcotics laws might well possess valuable property that is unrelated to narcotics. The forfeiture of such property may be a matter of great importance to him. And without the owner even being made aware of, or having a practical opportunity to challenge the forfeiture, its lawfulness is difficult to justify. In these circumstances, furthermore, no one but the owner can be relied on to protect the owner's interest."

Although the potential loss to the property owner may be great, forfeiture statutes generally allow notice by mail or publication. See 725 ILCS 150/4 (West 1998). When the property owner is incarcerated, however, he has little influence as to whether the notice given is actually received. "[A]s a prisoner, the owner is unable to insure that he will receive the notice once the post office has delivered it to the institution. The owner is entirely dependant on the institution to deliver his mail to him." *Weng*, 137 F.3d at 715. By contrast, the hardship to the

government in implementing procedures "reasonably certain to inform" the property owner of the forfeiture is small. As noted by the dissent in *Dusenbery*, "[t]he agency responsible for giving notice of the forfeiture, here, the FBI, is part of the same Government as the prisoner's custodian, the Bureau of Prisons." *Dusenbery*, 534 U.S. at 178, 151 L. Ed. 2d at 612, 122 S. Ct. at 705 (Ginsburg, J., dissenting, joined by Stevens, Souter and Breyer, JJ.). "Where a claimant is 'residing at a place of the government's choosing,' the seizing agency must take steps to locate the claimant in order to satisfy due process." *United States v. Giraldo*, 45 F.3d 509, 511 (1st Cir. 1995). See also *In re Forfeiture of $2,354.00 United States Currency*, 326 Ill. App. 3d 9 (2001) (where the State maintained that a prisoner's address is easy to ascertain).

The majority disagrees. The majority maintains there is no evidence in the record that the seizing agency knew or should have known Rashawn was incarcerated in Vandalia. Rashawn was incarcerated in a separate county for a separate crime approximately six weeks after officers seized the currency. 199 Ill. 2d at 161. Citing *Sarit v. U.S. Drug Enforcement Administration*, 987 F.2d 10 (1st Cir. 1993), a case it finds "helpful in the instant matter," the majority concludes that the notice to Rashawn's home was effective.

The majority fails to consider that when the officers interviewed Rashawn, he informed them he was out on bond for a prior arrest. A background check confirmed this arrest and also revealed that Rashawn had been arrested several times in Sangamon County, the last arrest on September 30, 1997. As the Third Circuit observed in *Foehl v. United States*, 238 F.3d 474, 480 (3d Cir. 2001), "although Foehl was not in jail at the time the notice was returned, he had been released on bail. We can safely assume that the Beaumont police had a very good idea of his whereabouts during that time."

More importantly, however, the majority fails to consider that the State is one entity and not several agencies or departments. The State, in the person of the State's Attorney of Cook County, prosecuted the forfeiture action at issue. At the same time, the State prosecuted Rashawn for possession of cannabis based upon an incident on March 28, 1995, and aggravated battery based upon an incident on May 9, 1996.[1] The State incarcerated Rashawn at Vandalia. A simple telephone call from the State's Attorney of Cook County to the Illinois Department of Correction would have provided the State's Attorney with the information needed to effectuate notice upon Rashawn.[2]

Lastly, the majority's reliance on *Sarit* is misplaced. In *Sarit*, DEA agents seized $41,448 from the plaintiffs' then-residence, located at 114 Alvin Street, on July 28, 1989. The attendant search was conducted without a warrant. On August 21, 1989, the plaintiffs filed a motion pursuant to Federal Rule of Criminal Procedure 41(e) seeking return of the currency. On September 1, the United States Attorney objected to this motion and filed a memorandum of law in which he informed the plaintiffs that the currency was being held for administrative forfeiture. Subsequently, on September 19, 1989, the DEA sent notice of the administrative forfeiture proceeding by certified mail to 114 Alvin Street. The notice was returned unclaimed. The DEA also published notice of the proceeding, with the first notice published on September 27, 1989. On October 13, 1989, the district court denied the plaintiffs' Rule 41(e) motion on equita-

---

[1]The State represented to the circuit court and to this court that "the offense for which Rashawn was incarcerated occurred almost one month after the incident that led to the forfeiture," that is, in June 1998 rather than the dates shown above.

[2]Information about inmates is available to the general public at the Illinois Department of Correction's internet site.

ble grounds, deferring to the administrative forfeiture proceedings. The plaintiffs' right to file a claim with the DEA expired on October 17, 1989. On November 2, 1989, the administrative forfeiture was decreed and entered.

In upholding the validity of the notice given by the DEA, the circuit court observed,

> "Given plaintiffs' vigorous (although tardy) pursuit of their claim, the fact that the government had been involved in ongoing court action on the very issue of the seizure of plaintiffs' currency, the government's awareness of plaintiffs' representation by counsel, and the frowned upon treatment of forfeitures, the call is a close one. [Citation.] Nevertheless, *Mullane* counsels us to consider *all* of the circumstances, and we find in this case other pertinent factors, including the government's memorandum and the conduct of plaintiffs' counsel, which compel us to uphold the finding of the district court." (Emphasis in original.)
>
> *Sarit*, 987 F.2d at 14.

The court of appeals found decisive that the plaintiffs' counsel had sufficient general notice of the risk that the property would be forfeited within the coming months if action were not taken; the statute covering forfeitures and the regulations interpreting it were available to counsel; and, once the plaintiffs and their counsel were aware that notice of the forfeiture would be sent in the ensuing two months, they could have notified the DEA of their own change of address. The court concluded that "the damage done by the ineffective notice could and ought to have been stemmed by plaintiffs' counsel." *Sarit*, 987 F.2d at 15.

*Sarit* is distinguishable from the present case. First, the plaintiffs in *Sarit* were not incarcerated at the time of the forfeiture proceedings. Second, the plaintiffs in *Sarit* had instituted an action in the district court for the return of the property and were represented by counsel. Knowledge of the statutes regulating the forfeiture proceedings and the risk that the property would be forfeited within a short time period was attributed to

counsel, and thus to the plaintiffs. Third, the plaintiffs in *Sarit* had received a memorandum informing them that the currency was being held for administrative forfeiture and providing them with a seizure number that had been assigned to the currency. The memorandum further informed the plaintiffs that if they filed a claim and cost bond with the DEA, the DEA would be required to refer the matter to the United States Attorney for the initiation of judicial forfeiture proceedings. In contrast, Rashawn was incarcerated at the time the State mailed the notice of forfeiture. The State did not attempt to notify Rashawn's criminal counsel of the forfeiture. Indeed, there is no indication in the record that Rashawn's criminal counsel continued to represent him once the criminal proceedings resulted in the convictions. Thus, the *Sarit* court's conclusion that "the damage done by the ineffective notice could and ought to have been stemmed by plaintiffs' counsel" (*Sarit*, 987 F.2d at 15), has no bearing in this case. Further, the State nowhere claims that it gave Rashawn information of the kind given the *Sarit* plaintiffs in the memorandum. The majority's assertion that *Sarit* is "helpful in the instant matter" is simply incorrect.[3]

The majority's holding that the notice given Rashawn was effective is based upon the premise that the State may be compartmentalized, such that information avail-

---

[3]At least one commentator has roundly criticized *Sarit*,

"While these unique facts make the decision easily distinguishable, it is still disturbing that the court allowed a claimant's right to contest the forfeiture to be snuffed out so cavalierly by the DEA. The decision is wholly out of sync with the Supreme Court's efforts to provide additional procedural safeguards in civil forfeiture actions." 1 D. Smith, Prosecution and Defense of Forfeiture Cases par. 9.03, at 9—53 (2001).

The commentator lists a number of cases which have distinguished *Sarit*.

able to the State's Attorney of one county or to the Illinois Department of Corrections is not attributable to the State's Attorney of another county. The majority's sole support for this holding is *Sarit*. However, this holding is not supported by *Sarit* and is contrary to case law. See *Dusenbery*, 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694 (in determining whether the government's actions were reasonable, the Supreme Court looked to the procedures followed by the FBI, the forfeiting agency, in mailing the notice, and the procedures followed by the federal correctional institution where the property owner was incarcerated, in processing certified mail addressed to inmates); *United States v. Minor*, 228 F.3d 352 (4th Cir. 2000) (since property owner was in federal custody, the DEA notices mailed to his home address and to the Forsyth County jail, where he had been held for a brief period following his arrest, were ineffective); *United States v. One Toshiba Color Television*, 213 F.3d 147, 150 (3d Cir. 2000) (where the DEA administratively forfeited certain property, the court held that "the circumstances surrounding the federal government's incarceration of a prisoner require greater efforts at ensuring notice than would be expected for individuals at liberty in society"); *United States v. McGlory*, 202 F.3d 664, 674 (3d Cir. 2000) (*en banc*) (on review of an administrative forfeiture proceeding conducted by the DEA, the court held: "at a minimum, due process requires that when a person is in the government's custody and detained at a place of its choosing, notice of a pending administrative forfeiture proceeding must be mailed to the detainee at his or her place of confinement"); *Lopez v. United States*, 201 F.3d 478 (D.C. Cir. 2000) (where notices sent by the DEA to the property owner's home and to the county jail were returned to the DEA, and where the DEA knew that the property owner was in the custody either of the State of Florida or of the Attorney General of the United States,

the DEA should have attempted to locate the property owner within the prison system); *United States v. Real Property*, 135 F.3d 1312 (9th Cir. 1998) (the requirements of due process were satisfied where the record showed that the government sent notice, by certified mail, to the property owner at the jail facility, and the watch commander at the jail testified that jail personnel sign for certified mail, open it in the presence of the inmate, and then distribute it directly to the inmate); *Boero v. Drug Enforcement Administration*, 111 F.3d 301, 306 (2d Cir. 1997) ("Boero was a prisoner in custody, having been transferred to his place of incarceration directly from a federal facility, and notice could easily have been given to him; the notice was indisputably inadequate and the district court has found *** that the DEA was responsible for the failure of notice"); *United States v. Clark*, 84 F.3d 378 (10th Cir. 1996); *Williams v. United States Drug Enforcement Administration*, 51 F.3d 732 (7th Cir. 1995); *State v. U.S. Currency in the Amount of $3,743.00*, 25 Kan. App. 2d 54, 956 P.2d 1351 (1998) (where the property owner was booked into the Shawnee County jail and later transferred to the Kansas State Correctional Facility, the court found the notice mailed to the property owner's home ineffective, rejecting the State's claim that it had no reason to know the property owner remained incarcerated during the criminal proceedings); *State v. $17,636.00 in United States Currency*, 650 So. 2d 900 (Ala. Civ. App. 1994); *State v. Jacobiak*, 1989 Ohio App. LEXIS 4747 (1989) ("by virtue of appellant's conviction and sentencing, appellee knew or should have known appellant was incarcerated at the time the petition was filed. Under the circumstances *** sending a copy of the petition by regular mail to appellant's trial attorney, was not 'an effort' that would ordinarily provide notice to appellant of the pendency of the forfeiture proceedings"); *People v. Smith*, 275 Ill. App. 3d 844 (1995). See also

*Garcia v. Meza*, 235 F.3d 287 (7th Cir. 2000) (where the notice sent by the Secret Service to the property owners was returned to the government five days later marked undeliverable, and where the property owners were actively seeking the return of their money through an administrative FTCA claim filed with the INS, "another attempt at written notice [by the Secret Service] would have been reasonable, even necessary, under the circumstances and would not have been too burdensome on the government"); *Montgomery v. Scott*, 802 F. Supp. 930, 936 (W.D.N.Y. 1992) ("It was unreasonable for the DEA to ignore its discovery that plaintiff had not received the original mailed notice. The Government must use the information it possesses to determine whether to rely on a particular method of notice; it may not ignore information that reveals that a method of notice is inadequate to provide an interested party with notice"); *Redd v. Tennessee Department of Safety*, 895 S.W.2d 332, 335 (Tenn. 1995) (where a drug task force of the Tennessee Department of Safety seized money in a raid at a mobile home and the home's owner told the task force officers that the petitioner had brought the money to her and told her to use it if she needed to, and where police later arrested the petitioner for an unrelated murder he committed two days before the raid, the court held "it is clear that the Department of Safety possessed the requisite knowledge of the petitioner's possible proprietary interest in the seized property. Such knowledge required the Department to give notice to the petitioner of the seizure and possible forfeiture of the property").

## CONCLUSION

The opportunity to be heard has "little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314, 94 L. Ed. at 873, 70 S. Ct. at 657. In the present case, the State

mailed the notice of the forfeiture to Rashawn's home. Although the State did not receive a return receipt from the mailing, the State inquired no further. The State failed to notify Rashawn of the forfeiture at the correctional center where he was incarcerated. Rashawn was thus deprived of the opportunity to contest the forfeiture and divested of his property without due process of law. It matters not that Rashawn was incarcerated on charges unrelated to the forfeiture. The State prosecuted and incarcerated Rashawn on those charges. The State was aware of the incarceration and knew, or should have known, that notice mailed to Rashawn at his home address would be ineffective. As held by the Supreme Court, notice sent to a prisoner's home is inadequate. *Robinson*, 409 U.S. at 40, 34 L. Ed. 2d at 49, 93 S. Ct. at 31. Such notice is not reasonably calculated to apprise the prisoner of the pendency of the forfeiture proceedings. *Robinson*, 409 U.S. at 40, 34 L. Ed. 2d at 49, 93 S. Ct. at 31-32. "[W]hen notice is a person's due, process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657.

I respectfully dissent.

JUSTICES McMORROW and KILBRIDE join in this dissent.